The Honorable Justice of the United States Court of Appeals, in and for the second judicial circuit, hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. All right. Good morning, everyone. We are thrilled to see a packed courtroom so that we can discuss some facts and some law with all of you today. We will begin with case number one. It's a consolidated appeal, USA v. Devonish, Jones, Backstrom, Moore, and Tavorn. Appeal number 24-1291, 24-1409, 24-1410, 24-1413, and 24-1414. We have several attorneys to welcome to the podium. We'll welcome Ms. Franklin Bess first. Thank you, Your Honors. And may it please the Court, Elizabeth Franklin Bess for Keith Jones, and I am going to be arguing this particular claim for all of our defendants. This appeal asks how far the government may go when it decides to put a camera and a microphone inside of a person's home. Our core argument here is that the continuous audio and video surveillance of Mr. Jones' occupied apartment was an exceedingly invasive search and that the Fourth Amendment tolerates, if at all, only in the rarest of cases, and that this drug investigation does not qualify. I will focus on three points, Torres, necessity, and minimization. First, under this Court's decision in United States v. Torres, covert television surveillance is exceedingly intrusive and inherently indiscriminate and therefore permissible only in limited circumstances and only with an extraordinary showing of both necessity and minimization. Torres upheld CCTV in a bomb-making safe house used by a terrorist organization that had, this Court's language, the plans, the materials, and the know-how to kill in gross, emphasizing that nobody lived there and that the space was devoted exclusively to illicit activity. The Court was explicit, a safe house is not a home. Here, by contrast, agents broke into Mr. Jones' residence, where he lived with his family, mounted a camera and microphone in his kitchen and living area, and then watched and listened for roughly two months, capturing even a sexual encounter and female nudity before they decided to minimize. This is precisely the kind of Orwellian intrusion other courts have warned against and demands a far higher justification than the government offered here. Torres also predicted that one day this Court would have to decide the constitutionality of CCTV in a private home. Today is that day. The government points to just one case approving video inside of a residence, United States v. Fall from the Eighth Circuit. But Fall simply applied wiretap standards to in-home CCTV, an approach that Torres rejected as inconsistent with the qualitatively different privacy interests at stake. Other video surveillance cases the government cites involve offices or other commercial premises, not living rooms and kitchens. And even as to the exterior of homes, the circuits are divided. Moore Bush in the First Circuit is a good example where they found that continuous surveillance of the exterior of the home violated the Fourth Amendment. So approving continuous video inside an occupied home for a drug case would take a dramatic step beyond anything that this Court or the United States Supreme Court has yet endorsed. What happened here is really constitutionally uncharted territory, not countenanced by Torres. And without a limiting principle, it risks swallowing the Fourth Amendment. So what's the limiting principle? Are you asking us to apply a per se rule, nothing in homes? Ever? No. I mean, I think that there are ways to sort of narrow what has happened here. Just we have spent some time kind of workshopping this to see what kind of a rule might make sense. But here, you know, maybe the requirement should be that normal investigative tools, including wiretaps, you know, have actually been exhausted. We know that that didn't happen here. Well, we had a pretty good showing of necessity, certainly sufficient for wiretaps and audio surveillance, right? And then Mr. Jones was using FaceTime to defeat that. And that is, you know, when the government requested the CCTV warrant, I mean, what they noted as sort of the reason for doing this, they had kind of two things that they were looking for. They wanted actual video of what was transpiring within the home, like actual drug deals. And then they also cited to the FaceTime video. So the problem is that that's not a limiting principle. I mean, you know, any time the government asks.  But let me go back to my question. I'm asking you, if we were to agree with you on this subject, how should an opinion be written? Well, again, so, you know, maybe in a case where normal investigative tools have already been exhausted so that there's nothing more that they can gain. And the language that they've used is that what they were doing already was fruitful. I mean, so we know that what they were already doing with sort of the regular wiretaps was, you know, getting some purchase. So you want a higher standard of necessity than was met here. I'm not sure exactly what that looks like, but anything else? Well, yes. I mean, I think, you know, perhaps before we're putting this sort of surveillance inside of someone's home, maybe there's some requirement of sort of imminence of danger. Right. I mean, so the kind of bomb making situation that Torres contemplates may be sort of a kidnapping. I mean, that kind of imminent danger to the community. And I do have sort of another factor that I think the court may consider. I mean, the minimization, right? That it would be tailored to sort of narrow and predictable windows of suspected criminal activity. I mean, what we had here was kind of a minimization regime that is used in the wiretap. It's not that minimal. It was not that minimal. OK. OK. Go ahead. On the minimization, I hear we also had the agency altering its minimization strictures on its own. Yes. They didn't like what they were coming up with when they were doing five on, two on, five off. So they switched it to four on, two off. What about judicial involvement? Can you tell me in changing what is the norm or the history there? Should we be thinking about something like that if the government wants to change how it's minimizing? Exactly. And I believe there are some cases that talk about kind of predictive quality of some of the surveillance that can lead to how a minimization is structured. So for example, what we had here was really kind of tied to the wiretap regime. But if we're going to talk about CCTV in somebody's home, where we know that based on other surveillance sort of techniques, they're able to tell when people are showing up, when parcels are being delivered, and the rest of it, maybe a tailored minimization requirement so that it is directed towards those kinds of activities that they know are occurring during those kind of discrete windows of time to get away from sort of this continuous monitoring that occurred in this case. Well, if what you're seeking is transactional, that would work. If you're wanting to see Mr. Jones at work on his own, packaging, et cetera, that wouldn't work, right? Well, I mean, so, you know, this was continuous monitoring any time he was home. You know, but again, if law enforcement knows that there is a parcel on its way, or they know that somebody is about to visit the home, for example, you know, those sorts of indications would provide some sort of narrowing function for when law enforcement can, you know, perhaps legitimately exercise some of the surveillance. At the risk of being repetitive, Ms. Franklin-Best, I guess I'm struggling with the extent to which you're asking us to draw bright lines, and I'm also struggling with potential application of a good faith exception in this context. I haven't seen it argued at this point in this case, but you would agree that it could be available in other cases like this under Fourth Amendment principles generally. I mean, I think the larger question is the constitutionality of allowing the CCTV inside of a... Could you answer my question about that? I'm sorry, Your Honor, I'm trying to do so. About the availability of a good faith exception where agencies... make a good faith effort at showing probable cause, necessity, and minimization efforts and get a warrant and comply with it. So, I mean, respectfully, I mean, as you noted, good faith was not argued in this particular case. I think that the larger issue is whether or not this court is going to countenance this level of... I understand you're making that larger issue argument. I'd like you to try to answer my question and then tell me about the larger issue, which you've been talking about more generally. Sorry. I don't believe that good faith should be available to save a warrant when what they have captured includes sexual activity among the people who live in the home. I mean, I think that it is sort of clear that what happened here was way beyond what any court should allow. I mean, beyond that, I mean, if the government wants to make a good faith argument in some case, I mean, based on... If people are having sex in the kitchen? Or in the living room. Okay, all right. Because they're home. Okay, all right. And I see that my time is up. Judge Kollar has a question. Thank you. If you could address the good faith exception a little bit more, because at least the way I look at it, that presumption applies once the warrant is issued, right? This, well, this happened afterwards. That would swallow the good faith exception. So could you address whether the presumption was there because of the warrant? I see your bigger question. I have some questions that I'm going to ask on that shortly. But to decide this case, we also need to determine whether the good faith exception would apply. So CCTV inside of people's residences is so unusual, and there is such a lack of case law allowing this sort of intrusion. It's hard to imagine how good faith would give cover to law enforcement officers. Because the U.S. district judge approved it, right? And did. But again, you know, it's difficult to argue good faith without seeing the specific, you know, in a specific case. I think that the facts here were so unusual that I think law enforcement should have realized that this was crossing a line and that good faith would not be available. Crossing a line that the district judge thought was okay under the circumstances. I mean, that's the nature of this kind of problem, right? Subject to this court's oversight. I mean, it's going to be up to this court to make a decision. How involved was the district court in the DA's decision to change the minimization that it was doing? I'm not aware that it was consulted at all. Thank you very much. Okay. Thank you, Ms. Franklin-Best. Okay. Ms. Kelly? Yes. All right. Yes. Good morning, Your Honors. My name is Anise Kelly, and I represent Mr. Moore. As to the conspiracy count, this court recently held in Page that evidence of repeated distribution quantity transactions can sustain a drug conspiracy conviction. However, without that, additional evidence is necessary. And then Page holds that it's the totality of the circumstances. And in the present case, we don't have those repeated. I thought Page indicated that one credit sale could be enough to support a conspiracy conviction. I apologize, Your Honor, if I misread that. I did not believe that. But I apologize if I'm wrong. But I also believe that Page held that the totality of the circumstances are the next question if you need additional evidence. What I would argue, in this case, you do need additional evidence. But I would also argue, even if Page held that one transaction is sufficient, I don't believe even that standard is met in this case. Because looking at the light and the evidence most favorable to the government, the sum of the evidence against Mr. Moore is the May 22 purchase of a half kilo of Coke. Moore's June phone call to Jones asking if he could swap that Coke for fentanyl. And in that June phone call, that relates to the two-pound meth that the government argued that that's how Jones Moore got into the two-pound meth transaction. But, in fact, it was Moore who called Jones and not Jones who called Moore. And Jones did not ask Moore for any favor. Instead, it was Moore who wanted to swap the Coke for the fentanyl and to give back the Coke. And then there's the notebook with jottings that may show that Moore owed Jones $7,000. That's it. That's the totality of the evidence against Moore, those three issues. And that's insufficient. As to Moore's sentence, the court failed to analyze whether Moore's acquittal on the meth charge was relevant to the conspiracy count and, therefore, aired when it used it to enhance Moore's sentence. To be relevant, conduct must demonstrate a significant similarity, regularity, and temporal proximity to the other transactions. There is nothing similar between the purchase of the Coke and the June request to swap the Coke for the fentanyl and the two-pound meth deal. Again, the court never analyzed the issue, but the two-pound meth deal has no relation to the May and June transactions. Let me ask you a specific question about that because the jury did acquit Moore of meth distribution and didn't attribute a specific weight of meth to Moore. Is it your position that we should infer the jury concluded that he didn't participate in any meth-related drug dealing or know that his Coke conspirators sold meth? It's Mr. Moore's position that the jury found he was not involved in meth at all. There were a couple of questions on the verdict form related to that, you know, on the amount. There were two questions on the amount of the meth, and both questions the jury answered no. And what about the reasonable foreseeability of what your Coke conspirators are doing in a drug? So, again, the sentencing court erred because in order for it to be responsible, just because your Coke conspirators engage in activity doesn't make you responsible. The sentencing court has to find that it was joint activity. And there's a number of factors within that joint activity that the court only addressed the foreseeability and did not address the other issues. So the court, the sentencing court, made conclusory findings without any analysis on the relevant conduct for the acquitted conduct issue. And it made no analysis for the joint activity either. And so one final point. The sentencing guidelines were amended seven and a half months after Mr. Moore's sentence to disallow acquitted conduct from sentencing. And so Mr. Moore asked that this court consider that and order it for resentencing and disallow the acquitted conduct to be taken into consideration. Is it your position that the district court erred by applying the guidelines in effect at the time? No, it is not, Your Honor. Okay. Let me ask you about one other thing. In your brief at page eight, you say the district court incorrectly attributed 18,144 kilograms of methamphetamine to Mr. Moore when it should have been 1,097 kilograms. Are there 18,000 kilograms of meth produced or distributed in the United States? I apologize, Your Honor. I'm not sure if that was a typo or if I failed to catch that. I apologize. It's a mind-boggling amount. What is the correct amount that the district court attributed to him that you think was erroneously attributed to him? The amount? Yes, they attributed the meth. And I'm sorry, any meth, we argue, should not be attributed to Mr. Moore. No meth at all. Okay. Thank you. Okay. Thank you, Ms. Kelly. All right. Next, we'll have Ms. Atwater. Good morning. May it please the court? My name is Grace Atwater, and I represent Defendant Appellate Sean Devonish. My brief addressed a number of issues, but I'd like to use my time to discuss the issue of assigning a criminal history point for an expunged conviction out of Indiana. It is our position that this was an error affecting Mr. Devonish's substantial rights. So, okay, I'm confused on the record here, Ms. Atwater. The PSR notes the expunged conviction but gives it zero points. Am I misreading that? The court in the record found that one criminal history point was to be attributed to Mr. Devonish's expunged conviction. So what was his total? Two points? His total was one point. Okay. I'm looking at 35 and 36 in his PSR. 35 is the cocaine dealing that was expunged. Yes. It gave him zero points in the PSR. 36 is possession of marijuana misdemeanor in 2013 and gives him one point for that. Yes. That's not expunged. It was expunged. The marijuana was expunged? Yes, Your Honor. Okay, okay. It is our position that that should not have been. So he's had two priors and both expunged. Correct, Your Honor. Thank you. Okay. In Indiana, you only have one chance for an expungement. So when you expunge your convictions, you expunge all of them. And then you don't get another chance if you commit a new offense. So it is our position that he should have been given no criminal history points. Indiana does not differentiate between types of relief based on the underlying facts of the case. So the government's position that Indiana expungements are a set-aside conviction is incorrect. Because there's only one remedy in Indiana, which is the sealing of the records, that remedy is granted to people who have been pardoned, people who have been wrongfully convicted, and exonerated people who were rightfully convicted. There is no differentiation in relief based on the underlying circumstances of the case. I think where you were headed is substantial rights. Can you address how any error affected Mr. Devonish's substantial rights? Yes. While it did not increase his criminal history category, and we acknowledge that. However, it made unavailable other reductions in his offense level. So the additional two-point reduction for zero criminal history points would have been available to him. In addition to the issue of the possession of the firearm analysis, we would argue that that is also an error. But for these errors, he would have been eligible for the two-point reduction, which would reduce his guideline range substantially. So we believe that that does affect his substantial rights, and I believe this court has found that an improper guideline range does affect a person's substantial rights. So just so that I'm catching up with you here, because I thought I knew something about the expunge conviction, but to affect substantial rights, you need to win on both the firearm issue and the expungement issue. Is that right? That's correct. It is our position, sort of a domino effect argument, that but for these errors, he would have been able to access these other reductions. Right. Okay. And we don't have any indication. I can easily imagine a district judge exercising the discretion that's given them under 3553A and say, fine, it's expunged, but I see you've got these prior dealing convictions, and here you are dealing again, and I somehow have a little trouble seeing you as a defendant as if this is really your first offense. And so I'm going to look through the expungement. Certainly that would, I believe that that would be the court's. But no indication that happened here. No indication that that happened. Thank you. He was, I see my time is up. You go ahead and answer. He was given a below guideline sentence regardless, but I think that that indicates that had his guideline range been lower, he may have gotten an even lower sentence. So his guideline range was started at 292, and he was given a sentence of 240 months. But with that reduction, he would be even many, many months, a number of years below that with the additional reductions. Okay. Thank you. Thank you. All right. With that, we turn to the government, and we welcome to the podium Mr. Reitz. Yes, sir. May it please the court. Brian Reitz for the United States. Starting with necessity of the CCTV, the defendant's arguments understate the investigatory and evidentiary difficulties faced by the government's stated objectives for the CCTV, while also ignoring this court's decision from last week in Carrasco Martinez on the investigation piece. After two years of investigation and two months of wiretap, the government's stated objectives were far from complete. At the CCT affidavit, we named 11 people, while 21 were ultimately indicted. So we were only about halfway through. What we didn't know included Mr. Jones' suppliers, key customers like Mr. Devinish and Marcus Miles, where Mr. Jones stored his drug proceeds, and how he paid for his drugs. Those are meat and potatoes in drug-dealing cases, and we were entitled to discover them. The affidavit itself rebuts the defendant's arguments. For the supplier, we needed the CCTV to hear the FaceTime calls, and for the customers, we needed the CCTV to see the drug deals inside Mr. Jones' house to identify the drug type, quantity, and which customer was buying. So, counsel, you're framing this as, you know, Title III requirements. And I got some of that in your brief. Page 23, you say this appeal involves compliance with the wiretap statute. You're talking about the government being entitled to identify the full extent of this organization, citing wiretap cases. Is it the government's position that the limiting principle here are the requirements of a wiretap? Essentially, you're reading in the Title III requirements. On the particularity, yes, that's what Torres says. Torres says if a CCTV complies with the wiretap's particularity requirements, it complies with the Constitution. I think it's fair to say Torres also says that we, and the Constitution, requires a reasonableness. So I think there is overlay to the particularity requirements. The reasonableness requirement, I think the court, in a CCTV case, the court should analyze both. That's where I think the heightened requirement comes from, is sort of the justification from the reasonableness. But on the particularity, meaning the necessity and the minimization draft issue here, Torres says the wiretap compliance with the wiretap equals compliance with the Constitution. Torres was bomb-making in a safe house. Correct. And just last week, albeit under the good faith exception, this court blessed a CCTV in a home, a garage, for drug dealing. Well, I'm not so certain Carrasco-Martinez helps you very much. We did receive your 28-J letter about that. Our court explicitly limited our holding in Carrasco-Martinez to the party's arguments. Agreed. And therefore, we assumed without deciding that the good faith exception applied. And I don't know how that helps you, especially considering, one, good faith is not an issue here. At least it has not been argued by the government. Two, CCTV is not covered under Title III. And three, even if we arguably agree with you that Title III principles apply, our circuit hasn't taken a position on whether good faith applies in Title III cases. So you're asking us to do a lot based on Carrasco-Martinez, which is not there. I hope to answer all of those points. I will start by Carrasco-Martinez. We are not saying that Carrasco-Martinez controls this case because, of course, it was decided on good faith. We do think Carrasco-Martinez helps because it rebuts the argument that defense just made that this court has never said a CCTV in a home for drug dealing is okay. That's not right. Carrasco-Martinez also was a detached garage. I agree. Which was, the government argued there, being used for this drug activity, illicit drug activity. It was not a home, a kitchen. Correct. And we, of course, agree that a camera in a kitchen is more intrusive than a garage. It's a general proposition. We agree with that. We also think Carrasco-Martinez, when discussing good faith, its necessity analysis helps us. We agree it does not control us. I don't mean to overstate that, but it does help and rebut the argument that this court has never said a CCTV and approved a CCTV in a house garage for drug dealing. It has. I think I have to address the good faith now, too. So good faith wasn't raised below, so we didn't raise it on appeal because it would be plain error and there is a circuit split and the court has never decided that issue. Arguing plain error in a circuit split is, of course, difficult. After Carrasco-Martinez. That's under the statute, right? Under the statute, yes. And we're not actually under the statute. Torres didn't borrow all of the statutory procedures for wiretaps. That is correct. I think the government has operated as if the CCTV, for the most part, has to comply with the wiretap statute. You're going to want audio and you're going to have to do that as a practical matter. But in terms of a challenge, and I don't see any challenge here to the audio, but it's not clear to me why good faith would not be available unless and until Congress acts. I think that's right. We just didn't view good faith. We didn't think it a great argument here because it wasn't raised below and we tend to avoid plain error arguments for the most part, especially in the difficulty of, I agree the circuit split is based on the statute and the wiretap statute when the CCTV doesn't fall under there. And so that is a difficult position for us as it is, though I would say perhaps post Carrasco-Martinez with Wengico, maybe that can revive a good faith argument here. That being said, we don't think we have to rely on good faith. We think the warrant was sufficient. Your Honor's point about not seeing a challenge to the audio as much as the video, that's the way we take defendant's arguments too. And if I might give an example why the video was necessary, I would point the court to the June 10th drug deal. Because of the CCTV, we know that Jones contacted Mr. Backstrom to order 18 pounds of meth. We know that Jones, after that was shipped, we know Jones picked it up, came back to his apartment, divvied it up, gave two pounds to Marcus Miles and 10 pounds to Steve Young. I think it's worth stepping back and thinking about what that evidence would have looked like if we didn't have the CCTV. So even assuming the government was surveilling Mr. Jones that day, they would have seen Mr. Jones go to a detached garage, pick up a box, take out a laundry bag, go back to his apartment, something happens in there, Marcus Miles comes out with a grocery sack. What you were telling us about what the government would not have seen had it not had the CCT for surveillance. How is that different from any other drug investigation? The challenges the government is pointing to in this brief about necessity and that you are raising here. And that brings me to the question we've been asking our colleagues on the other side about limiting principles. With what the government is arguing here, how do we not end up in a place where the government can get a warrant for visual plus audio, because we have visual plus here, inside a home in a run-of-the-mill drug investigation? The difference here is the failure of the wiretaps. So our district is no stranger to big drug conspiracies or wiretaps, and wiretaps are broadly successful in essentially every drug conspiracy case. This is the first CCTV that I'm aware of that our district has ever done. The reason we needed it here is because the wiretaps failed. We didn't know Mr. Jones' supplier. We didn't know his main customers. And the affidavit explained why the only way we were going to be able to do that was the CCTV. Is the government entitled to a challenge-free investigation? Because, you know, our panel is going to have to judge this as the strictures of the Fourth Amendment. All investigations have challenges, so we aren't saying that there can be no challenges. I think the better point is the court shouldn't issue an opinion or allow defendants' counter-surveillance techniques to completely evade law enforcement or punishment. And I think without the CCTV, as explained in our affidavit, that's the way this case was heading. We didn't know half the people in the case. We didn't know the suppliers. We didn't know the customers. There's no indication we would have ever been able to obtain that information without the CCTV. So the rule here is if wiretaps fail, the next step is a CCTV. So your limiting principle is simply if the wiretap doesn't work and it's a federal crime, you can move on? I agree with the first part. I don't think the second part. I don't envision a scenario where we're going to seek a CCTV to investigate a 922G1 case. I don't want to set the floor of what the crime is, but it has to be a serious crime. That's what Torres says. I also can't imagine that Judge Barker or whatever district court judges is going to give a CCTV for a minor crime, a 922G1. Kitchen, I think, is fine. I don't think any of our judges would give one for a bathroom or a bedroom. Well, what about the different affidavits in this case? It sounds like you knew a little bit about the supplier by the time. There wasn't just one authorization here. There were two. There were two. Of course, the first one helped us. We still didn't know who the cocaine supplier was, and Mr. Backstrom, who supplied both, we tentatively identified him as the meth dealer, but we didn't have enough to convict him beyond a reasonable doubt after one CCT affidavit. We talked a little bit about Torres, and it was bomb-making in a safe house. Here the government has reminded us that this was the largest drug conspiracy bust in Indiana's history, and certainly fentanyl and meth are lethal and lead to lost lives, but we don't have any of those facts here in the record that the government knew Jones's drugs were particularly lethal, were killing people, and then indeed the government went ahead and went for it a second month. I don't see facts that people were dying. It was so lethal that we needed to actually conclude this investigation after 30 days and stop people from dying. We've got the heightened, particularly destructive scenario we had in Torres. Here instead the government went for it 60 days have gone by still watching Mr. Jones in his kitchen. So we don't have evidence that anyone died from this fentanyl, I agree, but we all know, and investigators and the government get to use their common sense, and fentanyl is highly dangerous, and the sooner it was stopped the less likelihood someone would die, and as to the distinction between 30 and the 60 days, I think the key point there is we stopped, beyond the customers, we stopped whenever we could convict the supplier beyond a reasonable doubt, and the way to root out these dangerous crimes is stopping the supplier. We had to go as high in the food chain as we could, and we did not have evidence beyond a reasonable doubt to convict Mr. Backstrom after one month of CCTV, only after the second month did we. A couple of questions about minimization here, Mr. Reitz. As I understand it, this operation required, in essence, some live agents to be on duty 24-7, is that right? They were, we, for the two months, agents were there about 16 hours a day, so the waking hours of the day, it wasn't 24 months, but I know that is essentially the same for your honest question. And that kind of requirement is already going to make this sort of surveillance under current technologies then fairly rare and expensive.  Correct. What do we do, you know, I hate to use the phrase artificial intelligence, but what do we do, for example, if new tools make it possible to make, to do, carry out this kind of surveillance and minimization much more cheaply and automatically? I think that sort of invokes this, the mosaic theory, a lot of Fourth Amendment theories that courts are still dealing with. The easier it is and the more often, of course, it can be more intrusive. The courts may have to look into it. I don't really know moving forward, but I would simply say that's not what we had here. Those are very different. I'm trying to look ahead a little bit, however. Could you address this problem of minimization and the modifications and how that happened? Yes. Say 40 minutes an hour doesn't sound that minimal to me. This addresses your question and Judge Jackson-Akimi's question. The agents did that on their own. I think that is the standard practice, at least in our district, is that they have the authority to change the numerical incremental minimization as they see fit. This court has approved that in Kintana. That was a wiretap case. That was a wiretap case. I agree. I would say two things broadly. One, I don't think the constitutional reasonable line resides between two and four minutes, and I don't think that's what the defendants have really argued. Even stepping back, they have identified nothing that was admitted at trial that should have been minimized. The typical remedy for a Fourth Amendment violation and for minimization violations, as this court has said, is suppression of evidence at trial. There's nothing that should have been minimized and wasn't, was admitted at trial. Go ahead. But when we read the Supreme Court's Fourth Amendment cases, and they're talking about intrusiveness and privacy, et cetera, et cetera, they don't seem to be concerned only about what's admitted at trial. Yes, I think that sets the broader standards of what law investigators and the government should do and what district courts should decide is a reasonable minimization. But when we're talking about remedy for a defendant, it is essentially always tied to suppression. And that's what this court said. I guess I don't really understand. I mean, the court may criticize the time period. I don't know what remedy that provides the defendants because nothing was admitted at trial that shouldn't have been minimized. It's sort of outside the typical Fourth Amendment remedy paradigm in a criminal case. But it could go to the Fourth Amendment violation. It could make the whole CCTV unreasonable. I mean, take it at one extreme. You know, we're going to pick and choose what part of Title III we want. I don't think we need to minimize here. Or maybe we only need to minimize one minute a day. Is that reasonable? Again, I think the top-line remedy would be suppression. If the court thinks that the unreasonableness or reasonableness of the minimization could go to the overriding Fourth Amendment, I accept that may be true, but I don't think the reasonableness is in 2, 4, or 5 minutes. It may be in 59 out of 60 minutes unless there's a justification. I don't think the reasonableness line can be so small as to 1 or 2 minutes. Either way. And what about just further curtailing? We have Title III. That's statutory. It's gone through Fourth Amendment analysis. And all we did in TOR is to say that if you follow some of these procedures, it goes to the reasonableness when you're making bombs in a safe house. Here, you're watching someone in their kitchen. You're capturing intimate details. I don't think any of that is disputed. And there's no effort that I see to step back and say, how do we go further? How do we say, well, when is the criminal activity going to be? And let's start with that. Let's start with what we know from the wiretap and what we know from the rest of the investigation and cooperators of when we might be able to only capture criminal activity. And I didn't see that step happening first. And then, well, that's not working, so maybe we need to go broader. If anything, there was a broad, we're going to watch for a certain number of minutes, and then we're going to do less minimization. So I don't think I necessarily agree with that, because I think you have to take the investigation in the totality. And the two years of investigation, the two months of wiretaps, led the investigators to where they were at. So they knew that Mr. Jones spoke with the supplier via FaceTime, and they had no idea when that was going to happen. That's why they spot-checked for two minutes to begin with. They also knew that customers unknown to them came to Mr. Jones' house at unknown times. And on that, I want to stress, too, this isn't a house that has a front door where investigators can see who comes and goes at all times. This is a big apartment complex with about 100 units where Mr. Jones' door was on the inside. So we had no ability to say, that person who's entering the apartment complex is going to Mr. Jones' house. So if we had just taken the defendant's tact of when someone that we knew was involved entered the apartment complex, then we started recording or paying attention, we would have missed maybe all of the FaceTime communications with Mr. Jones' supplier. Is this the same apartment where agents were on the outside with binoculars and could see inside and see him do a deal or pass something to somebody or someone else, but the same apartment? Sometimes, but there was a couple instances of that, although that was an unreliable, continuous method, and some of the shrubbery blocked the shots as well. All right, I don't want to take you off by finishing your answer to Judge Lamar. So if we only did what the defendant's minimization says, we wouldn't have found out any new customers because we couldn't have started recording whenever an unknown person entered the broader apartment building. Again, we didn't know who was entering Mr. Jones' apartment room. So the spot checking was essentially the only way to reliably pick up the FaceTime or these unknown dealers, and that was the stated investigative goal, and I think one that's been blessed in wiretap cases and drug cases across the country historically as well. I'm running real short on time. If I can just briefly touch on the other issues raised. Judge Hamilton, you asked about Page. Page cited cases from the Fourth and Fifth Circuit saying that one drug deal of distribution level is sufficient. Even if it's not, we have at minimum two here, saying that two distribution level sales is not sufficient for a conspiracy undermines Page about a year after this court's en banc decision. The court should not take that step. On the expungement, Judge Hamilton, again, both the convictions were expunged. I'm going off memory. I think the other one got zero points and two because it was outside the 15-year window, but both were expunged, and either way, one or two points kept him in the same criminal history category. Right, but we have the cascading effect that he's arguing. Yeah, and the government is unaware of any case, and the defendants have not cited any case where plain error can be based on cascading arguments, especially, and one argument here that contradicts the record. The judge here found that Mr. Devenish's gun was possessed in connection with his drug dealing beyond a preponderance of the evidence, so that argument for the two point is out. You did mention that in your brief, that the district court made a preponderance finding on the gun. Where? Because I didn't see it. It's on Page 38 and 39 of the sensing transcript. It's also on Page 14 of my brief in the first block quote. The last part there is the judge saying, the burden is preponderance of the evidence, more likely than not, so I believe the enhancement applies speaking about the gun bump. That preponderance finding about the connection of the gun would then go to the safety valve. It would also go to 4C1.CA7, I believe, on the two level reduction. And Mr. Devenish had several guns, right? Yes, several guns. Several guns intermingled with drugs, drug paraphernalia, drug proceeds, et cetera. I did have a little trouble following the part of your brief where you seem to be arguing that expunged under Indiana law is different from expunged under the sentencing guideline provisions. So the terminology, I agree, is difficult, but the guidelines say expungement is complete removal of a conviction for reasons of innocence or illegal error. The guidelines then say set-asides are a remedial measure to remove the stigma from a conviction that does not completely remove a conviction. Indiana expungement, I know it says expungement, fits in the second category. They seal records. They don't completely remove them. The Indiana case law says it is a remedial measure to remove the stigma from previously convictees. Indiana also allows expunged convictions to be used in subsequent proceedings and subsequent sentencings. This is almost exactly like the California statute at issue in Carver, which is the Ninth Circuit decision from 2025, as cited in my brief. And the Ninth Circuit said in California's expungement statute, because it allowed expunged convictions to be used in future sentencing proceedings, is a set-aside. Under the guidelines, not an expungement, so it is awarded criminal history points. And the only thing, if I may, Judge Jackson, accuse me, you asked one question about the relevant conduct. And yes, the judge did make a finding about the joint activity that even if Moore wasn't responsible himself for the meth, he could have been found by the joint activity, the reasonable foreseeability. In fact, Moore was probably fortunate his drug responsibility wasn't higher because he wasn't held responsible for anything that LaDonna Jones and Mr. Jones did when he was well aware of that conduct. Does the district court get to any of that with Moore if the CCTV surveillance evidence is thrown out? Top line, we haven't made harmless error arguments for anyone on the CCTV, so I don't see a way to, other than Mr. Devin, as you pleaded guilty, I don't see a way for the court to sustain anyone's conviction if it throws out the CCTV. I mean, of course, I'm remiss if I say the court should not throw out the CCTV for all the reasons I've stated, but no, we haven't made that argument. It was integral to everybody's conviction. So it becomes irrelevant that Mr. Moore did not join the CCTV challenge? Yes. If there are no further questions, we'd ask the court to affirm. Thank you, Mr. Leitz. All right, we have some rebuttal. Let's see. First up, we have Mr. Brown. Welcome. Good morning, Your Honors. May it please the court. I'm Jerry Brown. I represent Mr. Backstrom. There are three points I'd like to address. We've got three minutes. First, the discussion of the necessity issue, and going back to Judge Hamilton's question about, well, what is the limiting principle? I think the cases make it clear that crafting a compelling and successful limiting principle in this issue is quite difficult. The courts have consistently recognized that CCTV surveillance is qualitatively different than a wiretap, and harken to invoking a heightened standard. In terms of articulating with great clarity what that heightened standard is, the courts have found it challenging, and I must concede, Judge Hamilton, I don't have a bright line rule to offer. And everybody has said it's exceedingly intrusive, and everybody has upheld its use. Yeah, and that gets to a practical problem. And being mindful that when you're arguing a suppression issue, the optics usually look bad. You have evidence that's incriminating the client, but the fact that evidence was secured by the method at issue can't be a basis for validating the fact that the methods were used. The question as to whether there was a violation of the Fourth Amendment does have to set that question aside. Torres does recognize or articulate the difference between a wiretap and video surveillance and invoked a heightened standard. The argument from the government, however, appears to try to collapse the standard back to the wiretap standard. We believe that that is an improper reading of the Torres case. The danger is, and I try to not overuse slippery slope arguments, but are we in a situation in which whenever the government runs into a roadblock in its investigation, the Fourth Amendment yields? And I acknowledge the difficulty of conducting a large-scale complex criminal investigation. There are many judgment calls that the government has to make in conducting that. However, there will be many cases in which they run into challenges, difficulties. Under the standard offered by the government, whenever they run into those challenges, they can say, well, we've gone as far as we can with the standard law enforcement investigative techniques. We now get to do CCTV surveillance. In other words, when the government's challenged, the Fourth Amendment yields. That's not consistent with our understanding of what the Fourth Amendment is. So I'd like to discuss the minimization issue. The issue of the concerns sought to be protected by the minimization isn't simply the matter of identifying evidence that should be suppressed at trial. The Fourth Amendment is intended to protect the privacy interests of people. Yes, and the Supreme Court has been dismantling remedies other than suppression. Could I ask you to address the government's point about minimization that no trial evidence would have been improper under a more rigorous minimization standard? Maybe I'm garbling that standard a little bit. I think I know what you're getting at. But the problem, if the test of whether minimization has been properly executed is whether no improper evidence was admitted at trial, that overlooks... No, that's not the question. The question is, what's the remedy for failing to minimize properly? And acknowledging your earlier comment that the suppression remedy has been pared back... No, no, no. The civil remedies are being undermined. The Bivens remedies for federal agents. We argue that suppression is the correct remedy in terms of whether the search was properly authorized. The interest sought to be protected by the Fourth Amendment is the privacy one. If the rule here is that unless the government introduces evidence at trial that should have been suppressed, there simply is no injury or insult to the Fourth Amendment rights of the people whose privacy was invaded, you've done significant damage to the Fourth Amendment. Let me not get into... No, please, please. I don't want to get into a debate about Bivens and my complaints about... I'm not going into Bivens either. The problem we have here is if the debate starts when evidence is being introduced at trial, it is overlooking the fact that there was a significant invasion of privacy without the government having to have exhausted the traditional means of investigation without invading the privacy of the persons and the inhabitants of the home where the surveillance took place. Mr. Brown, you're out of time. Are there any final points you want to make? No, that concludes my remarks. Thank you. Thank you. All right. We welcome back to the podium Ms. Kelly for one minute. Thank you, Your Honor. Just three quick points on the page, the standard under page. This court did not adopt those other circuits of one transaction. Instead, this court stated repeated, and that is not present in this case. So I believe the proper standard under page is the totality of the circumstances, and that also is not met. The second point, Mr. Moore did join co-defendant's argument. It's on page one in footnote number one where he joins it. On the joint activity issue, the sentencing court... There's three elements. The court only talked about the foreseeability. The court never addressed the scope of the criminal agreement and whether or not the meth was in furtherance of that agreement. The court only talked about the foreseeability. And so Mr. Moore argues that the court failed to perform any sort of analysis under the acquitted conduct or the joint activity and instead just made conclusory findings, which is not the standard. And the PSI does not save the court either because the PSI also does not analyze, doesn't make that finding of similarity, regularity, and temporal proximity between the meth which was acquitted and the other transactions. Thank you. Okay, thank you, Ms. Kelly. And then finally, we welcome back Ms. Atwater for one minute. Thank you. I just want to briefly address the government's contention that a California statute is similar to the expungement statute in Indiana because I do not believe that this circuit has addressed the issue of whether Indiana expungements specifically are set-asides or something else. And in California, I am not aware that if the statute gives the same remedy for these miscarriages of justice type expungements that for a 1.1J seems to contemplate. And in Indiana, the remedy, of course, it's remedial. It includes restoration of certain rights and necessarily a sealing of the records is going to reduce stigma. I think all expungements in the country do that. But if the court were to decide that Indiana expungements do not qualify as being excluded from the criminal history point calculation, it would be overbroad in that it would include those situations that for a 1.1J contemplates for miscarriages of justice and the like. All right. Thank you, Ms. Atwater. Now to appellant's table, Mr. Brown, Ms. Kelly, Ms. Atwater, we understand that you were appointed to represent your clients and you have the deep thanks of the court for the service to your clients and to the court. We will take the case under advisement and proceed to the next one.